

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUL 1 7 2014
Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on July 17, 2014

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| FUTURESELECT PORTFOLIO MANAGEMENT, INC.; FUTURESELECT PRIME ADVISOR II LLC; THE MERRIWELL FUND, LP; and TELESIS IIW, LLC, | ) ) ) ) ) ) | No. 89303-9 |
| Respondents, | ) ) ) | |
| v. | ) ) ) | |
| TREMONT GROUP HOLDINGS, INC.; TREMONT PARTNERS, INC.; OPPENHEIMER ACQUISITION CORPORATION; MASSACHUSETTS MUTUAL LIFE INSURANCE CO.; and ERNST & YOUNG LLP, | ) ) ) ) ) ) ) | En Banc |
| Petitioners, | ) ) ) | |
| and | ) ) | |
| GOLDSTEIN GOLUB KESSLER LLP and KPMG LLP, | ) ) ) | |
| Defendants. | ) ) | Filed JUL 1 7 2014 |

GONZÁLEZ, J.— Between 1997 and 2008, FutureSelect, a Redmond based financial company, invested nearly $200 million in Tremont's Rye Funds, which pooled and fed money into Bernie Madoff's fraudulent securities investment scheme. These investments were lost when Madoff's fraud unraveled. FutureSelect sued Tremont, Oppenheimer Acquisition Corp. and MassMutual (Tremont's parent companies), and Ernst & Young and Tremont's other auditors for their failure to conduct due diligence on Madoff's operations. FutureSelect alleged violations of the Washington state securities act (WSSA), chapter 21.20 RCW; negligence; and negligent misrepresentation.

The trial court dismissed on the pleadings, finding Washington's security law did not apply and that Washington courts did not have jurisdiction over Oppenheimer. The Court of Appeals reversed. Defendants seek to reinstate the trial court's findings. Oppenheimer argues that it lacks the requisite minimum contacts with Washington for personal jurisdiction. The defendants collectively argue that dismissing for failure to state a claim is appropriate because New York law—which does not provide for a private cause of action under its state securities act, rather than Washington law, which does—applies. Ernst and Young also contends that it is not a "seller" under the WSSA. We affirm the Court of Appeals.

## FACTS

The lead plaintiff, FutureSelect Portfolio Management Inc., is headquartered in Washington and manages a number of investment funds. The first named defendant,

Tremont Partners Inc., is headquartered in New York and serves as the general partner to the Rye Funds,[1] whose status as feeder funds to Bernard L. Madoff Investment Securities LLC (Madoff) is at the heart of this dispute.

The relationship between FutureSelect and Tremont began when a Tremont representative visited FutureSelect's Redmond offices in 1997 to solicit FutureSelect's investment in the Rye Funds. This initiated a series of discussions between FutureSelect and Tremont regarding the Rye Funds. Tremont claimed that it was offering FutureSelect a rare, and potentially fleeting, opportunity to invest with Madoff. Tremont also made assurances about its oversight and understanding of Madoff's operation. Relying on these assurances and the audit opinions of the accounting firm hired by Tremont, FutureSelect decided to invest in the Rye Funds in 1998. FutureSelect and Tremont had monthly ongoing communications about Madoff and the performance of the Rye Funds. Tremont claimed that its ongoing oversight and testing of Madoff proved satisfactory. Tremont also provided FutureSelect with purported facts proving the health of the Rye Funds.

Between 1998 and late 2008, when Madoff's Ponzi scheme finally came to light, FutureSelect continued to invest more funds in the Rye Funds as a result of the representations it regularly received from Tremont and its auditors. In all, FutureSelect invested $195 million with Tremont. But, Madoff never invested any of

---

[1] Tremont Partners serves as the general partner of the Rye Select Broad Market Fund, LP, the Rye Select Broad Market Prime Fund LP, and the Rye Select Broad Market XL Fund LP (collectively Rye Funds).

3

the capital he received through the Rye Funds or any other feeder. FutureSelect lost

its entire investment. Believing that Tremont had significantly misled it, FutureSelect

sued Tremont; MassMutual and Oppenheimer (Tremont's parent companies); and

Ernst & Young, KPMG,[2] and Goldstein Golub Kessler (Tremont's auditors).[3]

In its complaint, FutureSelect alleged that the defendants are liable for (1)

violating RCW 21.20.010[4] and RCW 21.20.430, (2) negligence,[5] and (3) negligent

misrepresentation.[6] According to the complaint, Tremont's liability is based on the

direct misrepresentations made by Tremont to FutureSelect that FutureSelect relied on

in making, maintaining, and adding to its investment in the Rye Funds. It alleged that

Tremont acted as MassMutual and Oppenheimer's agent or apparent agent.[7] It

---

[2] KPMG and FutureSelect have since entered arbitration.

[3] Goldstein Golub Kesseler and FutureSelect have since settled.

[4] FutureSelect believes all the defendants are liable for violations of the WSSA. Under the WSSA,

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
>
> (1) To employ any device, scheme, or artifice to defraud;
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

RCW 21.20.010.

[5] FutureSelect brings the negligence claim against Tremont only.

[6] FutureSelect brings the negligent misrepresentation claim against Tremont and Ernst & Young, not Oppenheimer and MassMutual.

[7] MassMutual and Oppenheimer purchased Tremont in 2001. FutureSelect believes that these companies exerted sufficient direct control over Tremont that the subsidiary's liability should be

alleged Ernst & Young made direct misrepresentations[8] that FutureSelect relied on in maintaining and adding to its investment in the Rye Funds. The defendants filed separate motions to dismiss on the pleadings. Without stating the specific grounds for dismissal, the trial court granted these motions in full after conducting a hearing and considering a number of pleadings, declarations, and briefs. FutureSelect obtained a CR 54(b) order granting final judgment on the dismissals, allowing this appeal.

The Court of Appeals reversed in part and affirmed in part, finding that (1) Washington has the most significant relationship to the state securities act claims, negligent misrepresentation claims, and agency claims; (2) the complaint sufficiently alleged personal jurisdiction over Oppenheimer; and (3) the trial court properly dismissed the apparent agency claim against Oppenheimer and negligence claim against Tremont. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.,* 175 Wn. App. 840, 890-95, 309 P.3d 555 (2013). We granted review and now affirm the Court of Appeals.

---

imputed to the parent companies. Further, FutureSelect alleges that both MassMutual and Oppenheimer stood to gain profit from Tremont's relationship with Madoff and were complicit in the misrepresentations made to FutureSelect.

[8] Ernst & Young audited the Rye Funds from 2000 to 2003. During that time, FutureSelect continued and enhanced its investment in the Rye Funds in reliance on Ernst & Young's audit statements. FutureSelect believes that Ernst & Young falsely claimed that it followed generally accepted auditing standards and that it improperly verified Madoff's trades purportedly made on behalf of the Rye Funds. FutureSelect also claims that Ernst & Young omitted material facts such as that it could not rely on Madoff's auditor and that it had not actually audited Madoff's own books. Because of a required verification of investment in the Rye Funds and the way the audit statements were addressed, FutureSelect alleges these misrepresentations were made directly to it and the other partners of the Rye Funds.

ANALYSIS

*I. Standard of review*

We review CR 12(b)(6) dismissals de novo. *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007) (citing *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998)). "Dismissal is warranted only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove 'any set of facts which would justify recovery.'" *Id.* (quoting *Tenore*, 136 Wn.2d at 330). All facts alleged in the complaint are taken as true, and we may consider hypothetical facts supporting the plaintiff's claim. *Id.* "Therefore, a complaint survives a CR 12(b)(6) motion if *any* set of facts could exist that would justify recovery." *Hoffer v. State*, 110 Wn.2d 415, 420, 755 P.2d 781 (1988) (citing *Lawson v. State*, 107 Wn.2d 444, 448, 730 P.2d 1308 (1986); *Bowman v. John Doe Two*, 104 Wn.2d 181, 183, 704 P.2d 140 (1985)). But, "[i]f a plaintiff's claim remains legally insufficient even under his or her proffered hypothetical facts, dismissal pursuant to CR 12(b)(6) is appropriate." *Gorman v. Garlock, Inc.*, 155 Wn.2d 198, 215, 118 P.3d 311 (2005). Similarly, we review a CR 12(b)(2) dismissal de novo. *In re Estate of Kordon*, 157 Wn.2d 206, 209, 137 P.3d 16 (2006) (citing *State v. Squally*, 132 Wn.2d 333, 340, 937 P.2d 1069 (1997)).

*II. Personal jurisdiction*

Oppenheimer argues that it lacks the requisite minimum contacts with Washington and our courts' exercise of personal jurisdiction would offend due process. *See* Suppl. Br. of Oppenheimer at 7. It is mistaken. At this stage of

litigation, the allegations of the complaint establish sufficient minimum contacts to survive a CR 12(b)(2) motion. However, Oppenheimer may renew its jurisdictional challenge after appropriate discovery has been conducted.

### A. Specific jurisdiction

For the exercise of specific jurisdiction under Washington's long arm statute to be proper, the defendant's conduct must fall under RCW 4.28.185 and the exercise of jurisdiction must not violate constitutional principles. *Grange Ins. Ass'n v. State*, 110 Wn.2d 752, 756, 757 P.2d 933 (1988) (citing *Werner v. Werner*, 84 Wn.2d 360, 364, 526 P.2d 370 (1974)). "In order to subject nonresident defendants and foreign corporations to the *in personam* jurisdiction of this state under RCW 4.28.185(1)(a)," Washington's long arm statute, we must find the following factors:

> "(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation."

*Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 767, 783 P.2d 78 (1989) (quoting *Deutsch v. W. Coast Mach. Co.*, 80 Wn.2d 707, 711, 497 P.2d 1311 (1972)). This inquiry encompasses both the statutory and due process concerns of exercising personal jurisdiction.

FutureSelect alleges jurisdiction is proper under RCW 4.28.185(1)(a), which extends jurisdiction arising out of "[t]he transaction of any business within this state," on the theory that Oppenheimer transacted business in Washington through Tremont, its agent. RCW 4.28.185(1) explicitly permits Washington courts to exercise jurisdiction over a principal based on the actions of its agent.[9] We apply the *Shute* factors to the allegations contained in FutureSelect's complaint, which we accept as true given the procedural posture of this case.

B. Shute *factors*

First, we find the complaint sufficiently establishes that Tremont acted as Oppenheimer's agent for purposes of the CR 12 motion. The complaint asserts that Oppenheimer (1) owned, directed, influenced management, and provided support services[10] to Tremont; (2) directed Tremont to change its auditor from Ernst & Young to KPMG; (3) placed its own president and director, who was also a vice president at MassMutual, on Tremont's board of directors;[11] and (4) actively managed and used its

---

[9] In relevant part, the statute provides that

> (1) Any person, whether or not a citizen or resident of this state, who in person or *through an agent* does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts. . . .

RCW 4.28.185 (emphasis added).

[10] These services consisted of compliance, audit, finance, and human resources.

[11] Specifically, FutureSelect alleges that "all five of Tremont's board members became MassMutual, Oppenheimer and/or OppenheimerFunds employees." Clerk's Papers at 18.

image to help Tremont with marketing and soliciting investment activity. For the purposes of the motion to dismiss, we find agency.

Accepting the agency relationship, we find the complaint also adequately alleges that Tremont's misrepresentations, which we presume without deciding were made on Oppenheimer's behalf and received in Washington, satisfy the first two *Shute* factors. Tremont directed numerous representations at FutureSelect. As a result of these representations, FutureSelect maintained and contributed millions of dollars to its initial investment in the Rye Funds. Much of this occurred after Oppenheimer's acquisition of Tremont. Accordingly, the allegations in the complaint sufficiently establish that Oppenheimer transacted business with FutureSelect in Washington through its agent.

We turn now to whether the assumption of jurisdiction offends traditional notions of fair play and substantial justice. Weighing (1) the quality, nature, and extent of Oppenheimer's activity in Washington, (2) the convenience of the parties, (3) the benefits and protection of Washington law, and (4) the basic equities of the situation, we conclude it does not.

First, the quality, nature, and extent of Tremont's activity in Washington were significant. The business relationship with FutureSelect extended from 2001 until 2008; involved the solicitation, offer, and sale of securities; and resulted in ongoing transfers of extremely large sums of money from Washington to Oppenheimer via Tremont.

Second, nothing in the record suggests that Washington courts exercising jurisdiction would pose an undue burden on Oppenheimer.

Finally, the benefits and protections of Washington law as well as the equities of the situation cut squarely in favor of our courts exercising jurisdiction. Our law explicitly protects investors from fraud and misrepresentations made by sellers of securities. *See* RCW 21.20.010. Not allowing Washington courts to enforce our statutes and regulations against nonresident companies that solicit, offer, and sell securities in this state would undermine the efficacy of this regulatory regime and create a perverse incentive for principals to insulate themselves from liability by operating exclusively through agents.

Given these considerations, we reverse the trial court and remand for further proceedings. Though we leave open Oppenheimer's ability to renew its motion, we find the trial court dismissed prematurely. Some limited discovery and a resolution of disputed jurisdictional facts are warranted. The trial court should determine whether an agency relationship existed between Oppenheimer and Tremont at any point during the relevant time period and, if so, whether jurisdiction is proper under the *Shute* factors.

*III. Choice of law*

Next, we turn to whether Washington or New York law applies to this case. Defendants argue that New York law applies because New York has the more significant relationship to the dispute and that dismissal on the pleadings was

warranted because there is no private cause of action under New York's state security law. On this record, we disagree. [12] The allegations in the complaint are sufficient to survive the defendants' CR 12(b)(6) motion.

*A. Actual conflict*

As a preliminary matter, when choice of law is disputed, "there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis." *Seizer v. Sessions*, 132 Wn.2d 642, 648, 940 P.2d 261 (1997) (citing *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 100-01, 864 P.2d 937 (1994)). Here, an actual conflict exists between the WSSA, ch. 21.20 RCW, and New York's Martin Act, N.Y. GEN. BUS. LAW art. 23-A, §§ 352-359. Specifically, the WSSA provides for a private right of action, *see* RCW 21.20.430, while New York's Martin Act does not, *see* N.Y. GEN. BUS. LAW art. 23-A, §§ 352-359.

*B. Significant relationship test.*

To settle choice of law questions, Washington uses the most significant relationship test as articulated by *Restatement (Second) of Conflict of Laws* § 145 (1971).[13] *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580-81, 555 P.2d 997

---

[12] It is important to remember that for choice of law questions "the ultimate outcome, in any given case, depends upon the underlying facts of that case." *Southwell v. Widing Transp., Inc.*, 101 Wn.2d 200, 204, 676 P.2d 477 (1984). This requires a subjective analysis of objective factors. *Id.* Though we hesitate to articulate any categorical rules, such an analysis does not lend itself readily to disposition on a CR 12(b)(6) motion.

[13] In relevant part, § 145 asks us to consider the following contacts:

(1976). FutureSelect argues we should also formally adopt § 148, which refines the § 145 factors for the fraud and misrepresentation context. *See* Suppl. Br. of Resp'ts at 6. Defendants, on the other hand, urge us to take an orthodox interpretation of *Haberman v. Washington Public Power Supply System*, 109 Wn.2d 107, 135-36, 744 P.2d 1032 (1987),[14] and apply § 145 exclusively. *See* Suppl. Br. of Tremont et al. at 5; Ernst & Young LLP's Suppl. Br. at 2-3. We agree with FutureSelect.

*Haberman* and § 145 provide a basic framework for choice of law questions.[15] But we have not shied from applying a different, more specific section of the *Restatement* when warranted by a particular tort. *E.g.*, *Williams v. Leone & Keeble, Inc.*, 171 Wn.2d 726, 735 n.6, 254 P.3d 818 (2011) ("On remand the Court of Appeals will have to review the trial court's choice of law ruling, giving application to the *Restatement (Second) of Conflict of Laws* § 146 [Personal Injuries]"). Given the

---

     (a) the place where the injury occurred,
     (b) the place where the conduct causing the injury occurred,
     (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
     (d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT § 145.

[14] In *Haberman*, we were faced with a choice of law question involving the WSSA and we resolved the issue by looking exclusively at § 145. 109 Wn.2d at 135-36.

[15] It is worth noting that in *Haberman* "[n]o party contend[ed] that another state's securities act applie[d]." *Id.* at 135. The question was whether the WSSA could apply to "an action brought in a Washington forum where out-of-state parties are under [Washington's] jurisdiction." *Id.* at 134. This is a different dispute than the one we face today, where parties are disputing whether Washington or New York law applies.

nature of misrepresentation, we find the factors in § 148 to be more helpful than those in § 145.

Previously, we developed a two-step analysis for the significant relationship inquiry under § 145. *Southwell v. Widing Transp., Inc.*, 101 Wn.2d 200, 204, 676 P.2d 477 (1984). Our adoption of § 148 does not alter this approach. Accordingly, first, courts will continue to evaluate the contacts with each interested jurisdiction. *Id.* The "approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found." *Johnson*, 87 Wn.2d at 581 (citing *Baffin Land Corp. v. Monticello Motor Inn, Inc.*, 70 Wn.2d 893, 900, 425 P.2d 623 (1967)). Second, courts will continue to evaluate the interests and public policies of potentially concerned jurisdictions. *Southwell*, 101 Wn.2d at 204. "The extent of the interest of each potentially interested state should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and the particular issue involved." *Id.* (citing *Johnson*, 87 Wn.2d at 582).

### 1. Evaluation of contacts

Under § 148, to determine the jurisdiction with the most significant relationship to the dispute, we must consider (1) the place where plaintiff acted in reliance on the representations; (2) the place where the plaintiff received the representations; (3) the place where the defendant made the representations; (4) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (5) the place

where a tangible thing, which is the subject of the transaction between the parties, was situated at the time; and (6) the place where the plaintiff is to render performance under a contract that he has been induced to enter by the false representations of the defendant. RESTATEMENT § 148.

Much like in *Southwell*, this case has "not presented this court with a record that is sufficiently developed to enable us to undertake the factual analysis necessary for proper resolution of the conflicts issue involved." 101 Wn.2d at 205. But for purposes of reviewing dismissal under a CR 12(b)(6) motion, we look to the complaint and conclude that FutureSelect could show that (1) Washington was the place where FutureSelect acted in reliance on the representations, (2) Washington was the place where FutureSelect received the representations, (3) Washington and New York were the places where the defendants made the representations, (4) Washington and New York were the primary places of business of the parties, and (5) it cannot be determined either way where FutureSelect was to render performance under the contract that it had been induced to enter by the false representations of the defendant.[16]

To complete this analysis, we must "consider which contacts are most significant" in addition to finding out where they are found. *Johnson*, 87 Wn.2d at

---

[16] The remaining factor—"the place where a tangible thing which is the subject of the transaction between the parties was situated at the time," *Restatement* § 148—is inapplicable because this transaction did not involve a tangible thing.

581 (citing *Baffin Land Corp.*, 70 Wn.2d at 900). The record is insufficient to permit us to engage in this inquiry, and so we leave it open.

In short, we find the contacts pleaded by FutureSelect to be sufficient to survive the defendants' CR 12(b)(6) motions on the choice of law issue.[17]

### 2. Interests and public policies of jurisdictions

Next, we turn to the second step of our analysis, which asks us to evaluate the interests and public policies of the jurisdictions. *Southwell*, 101 Wn.2d at 204. Here, Washington has a more compelling interest in protecting its investors from fraud and misrepresentation than New York does in regulating sellers of securities that may have perpetrated fraud or misrepresentation in another state.

At its core, this case does not involve a generalized regulation of securities sales, but the weighing of specific representations and assurances that allegedly targeted Washington investors. Washington has a strong interest in giving Washington investors the benefit of Washington law and in requiring the sellers of securities to comply with it.

We recognize the legislature's directive to interpret the WSSA to promote uniformity with federal securities law and those of others states. RCW 21.20.900.

---

[17] Ernst & Young encourages us to run a separate analysis for the choice of laws issue. This is proper because the record may show different significant contacts for the claims against Ernst & Young than for the claims against Tremont. However, at this procedural stage, a single analysis is sufficient because too many facts are in dispute and we must accept the allegations in the complaint as true. Accordingly, we accept that Ernst & Young can be established to be a seller of securities under the WSSA, as discussed in the analysis below, and so, the claims against Ernst & Young have many of the same contacts as Tremont.

But "[o]ur examination does not end there." *Kinney*, 159 Wn.2d at 844. "The Washington Act is unique; special emphasis is placed on protecting investors from fraudulent schemes." *Id.* at 844 (citing *Hoffer v. State*, 113 Wn.2d 148, 152, 776 P.2d 963 (1989) (*Hoffer* II)). Indeed, we have stated that "the 'primary purpose' of the Act is 'to protect investors from speculative or fraudulent schemes of promoters.'" *Go2Net, Inc. v. Freeyellow.com, Inc.*, 158 Wn.2d 247, 253, 143 P.3d 590 (2006) (emphasis omitted) (quoting *Cellular Eng'g, Ltd. v. O'Neill*, 118 Wn.2d 16, 23, 820 P.2d 941 (1991)). "The Act 'is remedial in nature and has as its purpose broad protection of the public.'" *Id.* (emphasis omitted) (quoting *McClellan v. Sundholm*, 89 Wn.2d 527, 533, 574 P.2d 371 (1978)). Applying New York rather than Washington law, which would deprive FutureSelect of a private cause of action, would necessarily frustrate this purpose. We decline to do so without clear evidence that New York has the more significant relationship to the dispute, which does not necessarily follow from this record.

*IV. Definition of "seller" under WSSA*

The final question at issue involves whether Ernst & Young can be considered a seller under the WSSA. Ernst & Young argues that because FutureSelect refers only to its audits and audit reports, which are purely professional services, and nothing related to the sale of securities, the trial court properly granted its motion to dismiss. Ernst & Young LLP's Suppl. Br. at 17-18. We disagree.

The WSSA imposes civil liability on anyone who sells a security in violation of certain provisions of the act. RCW 21.20.430(1). A "seller" includes any party whose acts were a "substantial contributive factor" to the sale. *Haberman*, 109 Wn.2d at 131. This is meant to be an expansive definition. Even so, we do require plaintiffs to establish "'something more'" in addition to the provision of routine professional services. *Hines v. Data Line Sys., Inc.*, 114 Wn.2d 127, 149-50, 787 P.2d 8 (1990). Because it is possible that FutureSelect can establish the requisite "something more," dismissal on the pleadings was inappropriate.

In *Hines*, we found that there was no evidence to indicate that the attorneys that were being sued under the WSSA had any personal contact with any of the investors or were in any way involved in the solicitation process. *Id.* at 149. There, we found "[t]he advice given by Perkins Coie to Data Line was not a catalyst in the sales transaction between Data Line and the investors." *Id.* at 150. This meant that Perkins Coie could not be held liable as a seller. *Id.*

The situation here is different. Among other things, *Hines* was resolved on summary judgment, not on a CR 12(b)(6) motion. *Id.* at 148. Because the question of whether someone was a substantial contributive factor is "necessarily a question of fact," *Haberman*, 109 Wn.2d at 132, it is not easily resolved on the pleadings as long as the complaint contains sufficient allegations.

Here, FutureSelect has met this requirement. Its complaint alleges that FutureSelect "would not have invested in the Rye Funds if the funds were not

17

audited" by Ernst & Young. Clerk's Papers at 37. Moreover, FutureSelect has also alleged that Ernst & Young "knew that its audits would be used by Tremont to solicit investors [and] also knew and intended that current investors would rely on the audits when deciding to maintain and increase their investments in the Rye Funds." *Id.* Finally, Ernst & Young asked FutureSelect to verify its investment in the Rye Funds and addressed its audits directly to the partners of the Rye Funds, which included FutureSelect. *Id.* at 23.

FutureSelect is entitled to an opportunity to prove what it alleged. We reverse the trial court's CR 12(b)(6) dismissal.

## CONCLUSION

Because FutureSelect has met its initial burden of production, we reverse the trial court's dismissal on the pleadings. On remand, the trial court shall (1) allow limited discovery on the jurisdictional issue and, if necessary, conduct a jurisdictional hearing to resolve any contested material facts and (2) give the parties an opportunity to fully develop the record surrounding the sale of securities to FutureSelect so that the trial court can properly consider the *Restatement* § 148 factors as they apply to the various defendants and determine whether Ernst & Young's acts were a substantial contributing factor to FutureSelect's decision to continue investing in the Rye Funds. We affirm the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

Gonzáleż, J.

WE CONCUR:

Madsen, C.J.

Stephens, J.

Wiggins, J.

Fairhurst, J.

Kulik, J.P.T.

No. 89303-9

GORDON McCLOUD, J. (concurring)—I fully agree with the majority's well-reasoned analysis and conclusions about jurisdiction and choice of law. I write separately only to comment on how broadly that opinion construes the word "sell[er]" in RCW 21.20.430(1)—so broadly that it includes the nonseller accounting firm Ernst & Young.

The majority is correct that in 1987, this court imported into Washington's securities law the majority rule in the federal circuits for interpreting the word "sell[er]" under federal securities law; we held that "sell[er]" must be construed broadly to include those whose actions were a "substantial contributive factor" in the sale. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 130-31, 744 P.2d 1032, 750 P.2d 254 (1987). But one year after *Haberman*, the United States Supreme Court decided *Pinter v. Dahl*, 486 U.S. 622, 653-54, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988). *Pinter* construed the word "sell[er]" in the related federal securities

law, and it expressly rejected the broad interpretation that most circuit courts had adopted under federal law and that we had adopted under state law.

Predictably, in 1989, we considered a post-*Pinter* challenge to the *Haberman* court's interpretation of our state's securities law. In *Hoffer v. State*, 113 Wn.2d 148, 152, 776 P.2d 963 (1989), we rejected the argument that the Supreme Court's analysis was more persuasive than our own and adhered to the "substantial contributive factor" interpretation of "sell[er]" as adopted in *Haberman*. The dissent in *Hoffer*, by contrast, asserted that "RCW 21.20.430(1), by its plain language, requires privity of the seller and the person buying the security." *Id.* at 153 (Pearson, J., dissenting). It also noted that "[t]he underpinnings of *Haberman* came from lower federal court decisions which are no longer authoritative in light of the *Pinter* ruling." *Id.*

The *Hoffer* dissent made good sense at the time it was written. The very federal cases upon which the *Haberman* decision relied were expressly disapproved by *Pinter*. In fact, that dissent makes even more sense now, 27 years later, as even more circuits that the *Haberman* majority relied on have repudiated their earlier adoption of the nontextual "substantial contributive factor" test. For example, the *Haberman* majority explicitly relied on a Ninth Circuit case in adopting our test. *Haberman*, 109 Wn.2d at 127 (citing

2

*Anderson v. Aurotek*, 774 F.2d 927, 930 (9th Cir. 1985) (per curiam)). In 2007, that case was repudiated by the Ninth Circuit in light of *Pinter*. *Sec. & Exch. Comm'n v. Phan*, 500 F.3d 895, 906 n.13 (9th Cir. 2007).

Nevertheless, the majority is absolutely correct that *Haberman* is controlling, not the *Hoffer* dissent. I therefore concur in the majority's decision. In light of *Haberman* and *Hoffer*, FutureSelect has sufficiently alleged that Ernst & Young was a "sell[er]" to avoid dismissal on the pleadings.