2017 MAY 22 AM 11:47

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| NAM CHUONG HUYNH and LIN R. BUI, husband and wife, and JO-HANNA READ, as guardian ad litem for H.H.1, H.H.2, and H.H.3, minors, | No. 74241-8-I (consolidated with No. 74242-6-I) |
| Appellants/Cross Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| AKER BIOMARINE ANTARCTIC AS, a Norwegian corporation; AKER BIOMARINE ANTARCTIC II AS, a Norwegian corporation, | |
| Respondents/Cross Appellants, | |
| MAREL SEATTLE, INC., a Washington State corporation, | |
| Defendant. | FILED: May 22, 2017 |

APPELWICK, J. — Huynh, a Washington resident, was injured on a fishing

vessel docked in Uruguay while performing work for his employer, Marel Seattle.

He sued Marel Seattle, a Washington corporation, and the two Norwegian

companies that Marel Seattle had contracted with to refurbish fishing vessels:

AKAS and AKAS II. AKAS and AKAS II moved to dismiss for lack of personal

jurisdiction. The court denied the motion as to AKAS II, but granted it as to AKAS,

except to the extent that AKAS was potentially liable as successor to AKAS II. Both AKAS II and Huynh contend that the trial court erred in analyzing personal jurisdiction. We affirm.

### FACTS

On January 6, 2012, Nam Huynh was performing work for his employer, Marel Seattle, on assignment in Uruguay. Huynh was a welder working on a refurbishment project onboard a fishing vessel (F/V), the F/V Antarctic Sea. He suffered an electrical shock while working onboard.

Huynh's employer, Marel Seattle, is a Washington corporation that designs, manufactures, and installs seafood equipment and systems. It manufactures much of its seafood processing equipment in its Seattle facility, but also orders supplies from and installs equipment throughout the world.

Marel Seattle had a lengthy relationship with Aker Biomarine Antarctic AS (AKAS). AKAS is a Norwegian subsidiary of Aker Biomarine AS. Aker Biomarine AS primarily sells krill related products. This business includes the harvesting of krill and producing krill oil and krill meal. AKAS is involved in Aker Biomarine AS's krill operations. Currently, AKAS owns two Norwegian vessels: the F/V Saga Sea and the F/V Antarctic Sea, the vessel involved in this case. Since at least 2005, AKAS has contracted with Marel Seattle for millions of dollars of work that Marel Seattle has performed on AKAS vessels.

On or about August 31, 2011, AKAS purchased a new company, Startfase 465 AS. AKAS changed the company's name to Aker Biomarine Antarctic II AS

2

(AKAS II) and amended its bylaws. AKAS II was a wholly owned subsidiary of AKAS. The purpose of AKAS II was to acquire the F/V Antarctic Sea and fund the necessary upgrades to its seafood processing systems. AKAS II purchased the F/V Antarctic Sea on October 18, 2011.

In July 2011, prior to the formation of AKAS II or the purchase of the F/V Antarctic Sea, Sindre Skjong, an AKAS employee, approached Marel Seattle regarding work to be done on the F/V Antarctic Sea. Skjong had previously worked extensively with Marel Seattle on the refurbishment of the F/V Saga Sea. On November 5, 2011, Marel Seattle provided a quote for work that it would perform work on the F/V Antarctic Sea to convert it to krill processing. This work was to be done in Uruguay by Marel Seattle employees, who would travel from Washington to Uruguay. Huynh traveled to Uruguay to perform work on the F/V Antarctic Sea as a result of this contract. His injury occurred on January 6, 2012.

When work on the F/V Antarctic Sea was complete, AKAS II sold the vessel to AKAS. The two entities merged on August 18, 2012, with AKAS II transferring its remaining assets and liabilities to AKAS.

On November 25, 2014, Huynh sued AKAS, AKAS II, and Marel Seattle in King County Superior Court. He alleged that AKAS and AKAS II were negligent in that the vessel and equipment were in an unsafe condition, and the companies or their agents caused the defect in the equipment, knew or should have known of the unsafe condition, failed to properly inspect the equipment, and failed to warn Huynh of the hazards.

AKAS and AKAS II moved to dismiss for lack of personal jurisdiction pursuant to CR 12(b)(2). AKAS and AKAS II argued that they did not commit any acts that were sufficiently connected to Huynh's cause of action such as would support personal jurisdiction. They contended that AKAS II, not AKAS, entered into the F/V Antarctic Sea contract with Marel Seattle. And, they contended that the connection between the contract and Huynh's injury was too attenuated to support personal jurisdiction. AKAS and AKAS II requested a preliminary hearing under CR 12(d) to resolve this issue.

The trial court held an evidentiary hearing on the issue of personal jurisdiction over AKAS and AKAS II. As a threshold matter, the court sought to determine which entity, AKAS or AKAS II, entered into the contract with Marel Seattle for refurbishment of the F/V Antarctic Sea. The court's ruling on this question was essential in determining whether AKAS or AKAS II had the minimum contacts with Washington necessary to establish personal jurisdiction. The court found that the parties to the F/V Antarctic Sea contract were Marel Seattle and AKAS II. Thus, it concluded that it had specific personal jurisdiction over AKAS II. Reasoning that AKAS II's contacts could be imputed to AKAS for claims based on AKAS's liability as AKAS II's successor, the court also determined that it had personal jurisdiction over AKAS for its imputed negligence. Therefore, the court denied the motion to dismiss pursuant to CR 12(b)(2) as to AKAS II, and granted it with respect to AKAS other than for its potential liability for AKAS II's misconduct.

Both parties moved for discretionary review, which the commissioner granted.[1]

## DISCUSSION

The parties both argue about the extent of personal jurisdiction in this case. AKAS II argues that the trial court erred in determining that it had personal jurisdiction over AKAS II. Huynh contends that the trial court erred when it determined that it had personal jurisdiction over AKAS only to the extent it was liable for AKAS II's conduct. To resolve these questions, we first address the question of which entity was party to the F/V Antarctic Sea contract, as this issue affects the personal jurisdiction analysis.

The trial court decided this case after an evidentiary hearing pursuant to CR 12(d). CR 12(d) permits the court to hear and determine specific defenses, including a lack of personal jurisdiction, prior to trial. Washington courts have not clarified the standard of review on appeal after a CR 12(d) evidentiary hearing. However, federal courts interpreting CR 12's federal counterpart offer guidance.[2]

---

[1] In another motion, AKAS moved to strike certain citations in Huynh's opening brief. AKAS contends that Huynh improperly cited to documents that were not part of the evidentiary hearing record to support factual statements in his brief.

But, the trial court listed the materials it relied upon in reaching its decision on the motion to dismiss. Included in this list is Huynh's opposition to AKAS and AKAS II's motion to dismiss for lack of personal jurisdiction. The documents that AKAS challenges as outside the evidentiary hearing record were attached as exhibits to this brief in opposition. Thus, the trial court reviewed these documents in addition to the evidence submitted at the evidentiary hearing. To the extent that these documents were not admitted as exhibits at the evidentiary hearing, we treat them like exhibits that were offered but not admitted. Therefore, we deny AKAS's motion to strike.

[2] Where a Washington rule is substantially similar to its federal counterpart, Washington courts may look to the interpretation of the corresponding federal rule

Federal courts review de novo a lower court's dismissal for lack of personal jurisdiction, but review for clear error the court's underlying factual findings. See, e.g., Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014), cert. denied, 135 S. Ct. 2860, 192 L. Ed. 2d 896 (2015). The federal clear error test is analogous to the substantial evidence test used by Washington courts. Steele v. Lundgren, 85 Wn. App. 845, 850, 935 P.2d 671 (1997). Thus, to the extent the parties raise questions of fact, we review under a substantial evidence standard.

Substantial evidence is evidence in sufficient quantum to persuade a rational, fair-minded person of the truth of the premise. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). If the standard is met, a reviewing court will not substitute its judgment for that of the trial court, even if it might have resolved a factual dispute differently. Id. at 879-80. Questions of law and conclusions of law are reviewed de novo. Id. at 880.

I.    F/V Antarctic Sea Contract

Huynh argues that the trial court erred in deciding that AKAS was not a party to the F/V Antarctic Sea contract. He contends that AKAS and AKAS II's objective manifestations demonstrate that AKAS, the entity that had previously contracted with Marel Seattle, intended to enter a similar contract. Huynh also asserts that apparent authority demonstrates that AKAS was a party to the contract. He contends this is so, because AKAS II held AKAS representatives out as its agents,

---

for guidance. Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp., 172 Wn. App. 799, 806, 292 P.3d 147 (2013), aff'd, 182 Wn.2d 272, 333 P.3d 380 (2014).

leading Marel Seattle to believe that it was contracting with AKAS, as it had in the past. Huynh urges us to apply a de novo standard of review to the contract issue, arguing that the issue is whether the trial court misapplied the law to the facts.

The fundamental goal in contract interpretation is to determine the parties' intent. Berg v. Hudesman, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). Washington follows the objective manifestation theory of contracts. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). This means that courts attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, not the unexpressed subjective intent of the parties. Id. Words in a contract are given their ordinary, usual, and popular meanings unless the entirety of the contract demonstrates a contrary intent. Id. at 504. This court applies the "context rule" in determining the meaning of contract language. Berg, 115 Wn.2d at 666-69 (adopting the context rule). Under this rule, courts may consider the context surrounding a contract's execution. Hearst, 154 Wn.2d at 502.

Here, the contract between the parties was not reduced to a writing executed by both parties. On November 5, 2011, Marel Seattle sent a quote for the refurbishment project of the F/V Antarctic Sea. The quote was addressed to Webjorn Eikrem[3] and included "AKER BIOMARINE" in the heading. Aker Biomarine is the parent company of both AKAS and AKAS II. Eikrem accepted the quote and authorized the work to proceed via e-mail. The nature of this formation

---

[3] During the relevant time period, Eikrem was an executive vice president and board member of AKAS, as well as a board member of AKAS II.

process required the court to consider e-mails and other contextual evidence, particularly to establish who the parties to the transaction were.

The trial court admitted 89 exhibits. Multiple witnesses testified at the evidentiary hearing. The court relied on this extrinsic evidence in determining which Aker entity was a party to the F/V Antarctic Sea contract. It acknowledged that Marel Seattle had a prior relationship with AKAS doing substantially the same work, and that the e-mails discussing the work to be done on the F/V Antarctic Sea did not specify which entity was contracting with Marel Seattle. However, the court found other evidence to be dispositive: later corrections to invoices, recognizing that AKAS II was the contracting party.

Courts may interpret a contractual provision as a matter of law when "(1) interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." Tanner Elec. Coop. v. Puget Sound Power & Light Co., 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). Here, the trial court had to examine extrinsic evidence and decide between the reasonable inferences that could be drawn from the evidence. Interpretation of the F/V Antarctic Sea contract is not a question of law for this court to review de novo. Accordingly, we limit our analysis of the contracting parties to whether substantial evidence supports the trial court's findings.

Marel Seattle had been working with AKAS since at least 2005. It worked extensively with Skjong on the refurbishment of the F/V Saga Sea project. Skjong again contacted Marel Seattle in July 2011, prior to AKAS II's existence, about

refurbishing the F/V Antarctic Sea. The work to be done on the F/V Antarctic Sea was similar to prior work Marel Seattle had performed for AKAS. None of AKAS II's representatives informed Marel Seattle that AKAS II, not AKAS, was contracting for work to be performed on the F/V Antarctic Sea.

And, the F/V Antarctic Sea agreement called for Marel Seattle to utilize equipment that it had previously manufactured for AKAS. Marel Seattle had completed $7 million worth of work for AKAS's vessel, the F/V Antarctic Navigator. This included $4 million of manufacturing and assembly in Seattle. This equipment was never installed on the F/V Antarctic Navigator. Instead, Marel Seattle retained some of that equipment in Seattle in storage. AKAS owned this equipment. AKAS expressed that this equipment should be moved from storage and used on the F/V Antarctic Sea. Marel Seattle's quote included moving this equipment and rebuilding existing equipment in the list of services it would provide on the F/V Antarctic Sea project. Thus, during its negotiations over the F/V Antarctic Sea work, Marel Seattle had no reason to believe that it was dealing with a company other than AKAS.

Subsequent e-mails clarified which Aker Biomarine entity was a party to the contract. On January 2, 2012, Marel Seattle's Vice President and Chief Financial Officer Kenneth Olsen sent e-mails attaching invoices for work on the F/V Antarctic Sea. One set of invoices was addressed to AKAS, while another invoice was addressed to "Aker Biomarine ASA." On January 3, 2012, Eikrem responded to the invoices, requesting that Olsen change the invoices to be for AKAS II, the

owner of the F/V Antarctic Sea. Eikrem stated that all invoices for the F/V Antarctic Sea project needed to be addressed to AKAS II. Olsen thanked Eikrem for the clarification, and Marel Seattle later provided corrected invoices addressed to AKAS II.

Huynh further argues that Eikrem and Skjong had apparent authority to act on behalf of AKAS. An agent can bind a principal to a contract when the agent has actual or apparent authority. Hoglund v. Meeks, 139 Wn. App. 854, 866, 170 P.3d 37 (2007). Apparent authority depends upon the objective manifestations of the principal. Smith v. Hansen, Hansen & Johnson, Inc., 63 Wn. App. 355, 363, 818 P.2d 1127 (1991). The principal's objective manifestations to a third person, including manifestations made through the agent, will support a finding of apparent authority if (1) they cause the one claiming apparent authority to actually believe that the agent has authority to act for the principal and (2) they are such that the claimant's actual belief is objectively reasonable. Id. at 364.

Whether apparent authority exists is a question of fact. Id. at 362-63. On appeal, this court reviews whether a finding of apparent authority is supported by substantial evidence. Id. at 363. The trial court did not make a finding on the apparent authority argument. The absence of a finding on a material issue is presumed to be a negative finding against the party with the burden of proof. Fettig v. Dep't of Soc. & Health Servs., 49 Wn. App. 466, 478, 744 P.2d 349 (1987).

Here, there is no dispute that Eikrem and Skjong had actual authority to bind AKAS II. However, Huynh argues that Eikrem and Skjong played key roles

in AKAS's prior contracts with Marel Seattle, approached Marel Seattle with a similar proposal, and failed to disclose that they were acting as agents for anyone other than AKAS. Therefore, he contends that Marel Seattle must have relied on that prior actual authority to conclude that Eikrem and Skjong had apparent, if not actual, authority to enter into the F/V Antarctic Sea contract on behalf of AKAS. But, Marel Seattle's representatives have not claimed that they relied on such apparent authority or that they believed they entered into a contract with AKAS rather than AKAS II. In fact, Marel Seattle's president, Henrik Rasmussen, explained that he never knew the complexities of Aker Biomarine's corporate structure or understood the difference between the different Aker Biomarine companies. For his purposes, it was sufficient to treat Aker Biomarine as a single customer with multiple vessels. Therefore, the argument that Marel Seattle relied on apparent authority is unsupported by the record and we reject it.

Huynh essentially asks this court to reweigh the evidence to determine which interpretation is more reasonable. We will not do so. The evidence supports the trial court's finding that AKAS II was the party to the contract. This evidence reveals that Marel Seattle did not know or care which entity it was contracting with to provide services on the F/V Antarctic Sea.[4] When AKAS II asked Marel Seattle to change the invoices, Marel Seattle complied without objection. Therefore, we

---

[4] Huynh emphasizes the fact that AKAS II did not yet exist when Skjong first contacted Marel Seattle about the F/V Antarctic Sea. But, AKAS II existed when Marel Seattle provided a quote for the services it would perform. This quote is what gave rise to the agreement between the parties.

hold that the trial court did not err in finding that AKAS II, not AKAS, was a party to the F/V Antarctic Sea contract.

## II. Specific Personal Jurisdiction over AKAS II

AKAS II argues that the trial court erred in concluding that AKAS II is subject to specific personal jurisdiction in Washington.[5] It contends that the trial court conflated the standards for personal jurisdiction over a contract dispute with those pertaining to torts. And, it argues that the United States Supreme Court's decision in Walden v. Fiore, ___ U.S. ___, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014) significantly altered the personal jurisdiction analysis.

Personal jurisdiction is a question of law that this court reviews de novo where the jurisdictionally relevant facts are undisputed. Failla v. FixtureOne Corp., 181 Wn.2d 642, 649, 336 P.3d 1112 (2014), cert. denied, 135 S. Ct. 1904, 191 L. Ed. 2d 765 (2015). The plaintiff bears the burden of proving that personal jurisdiction exists. MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc., 60 Wn. App. 414, 418, 804 P.2d 627 (1991). Where a motion to dismiss for lack of personal jurisdiction is resolved without an evidentiary hearing, the plaintiff's burden is only that of a prima facie showing of jurisdiction.[6] State v. LG Electronics, Inc., 186 Wn.2d 169, 176, 375 P.3d 1035 (2016), cert. denied, 137 S. Ct. 648, 196 L. Ed. 2d 522 (2017).

---

[5] We do not address the question of whether general jurisdiction exists over the defendants, because while Huynh contends that the facts establish general jurisdiction, he does not devote any of his brief to this argument.

[6] Here, the trial court held an evidentiary hearing.

For a Washington court to exercise specific jurisdiction over a nonresident defendant, the defendant's conduct must fall within the Washington long-arm statute and the exercise of jurisdiction must not violate constitutional principles. FutureSelect Portfolio Mgmt, Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 963, 331 P.3d 29 (2014). Washington's long-arm statute, RCW 4.28.185, provides in part,

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any said acts:
>
> (a) The transaction of any business within this state;
>
> (b) The commission of a tortious act within this state ;
>
> . . . .
>
> (3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him or her is based upon this section.

Due process requires that a nonresident has minimum contacts with the forum state such that jurisdiction in the state does not offend traditional notions of fair play and substantial justice. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

Three factors must be met for a court to subject a nonresident defendant or foreign corporation to personal jurisdiction in Washington:

> "(1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction

by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protections of the laws of the forum state afforded the respective parties, and the basic equities of the situation."

Shute v. Carnival Cruise Lines, 113 Wn.2d 763, 767-68, 783 P.2d 78 (1989) (quoting Deutsch v. W. Coast Mach. Co., 80 Wn.2d 707, 711, 497 P.2d 1211 (1972), reversed by, 499 U.S. 585, 111 S. Ct. 1522, 113 L. Ed. 2d 6222 (1996). This inquiry incorporates both the statutory and due process concerns of exercising personal jurisdiction. FutureSelect, 180 Wn.2d at 964.

A. Purposeful Act or Transaction

To satisfy the first factor, the plaintiff must show that the defendant purposefully did some act or consummated some transaction in Washington. Shute, 113 Wn.2d at 767-68. This purposeful availment requirement protects a defendant from being hailed into a jurisdiction because of contacts that are random, fortuitous, or attenuated, or because of the unilateral activity of another party or a third person. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). Under this requirement, jurisdiction is proper where the defendant's own contacts with the forum state create a " 'substantial connection' " with the forum state. Id. (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957)). This is so, because the defendant has benefited from the benefits and protections of the forum state in doing business there, so it is fair for the defendant to be required to submit to litigation in the forum. Id. at 476.

14

To determine whether the defendant's contacts with the forum demonstrate purposeful availment, a court assesses the quality and nature of the defendant's contacts with the forum state. SeaHAVN Ltd. v. Glitnir Bank, 154 Wn. App. 550, 565, 226 P.3d 141 (2010). A nonresident defendant may purposefully avail itself of the forum state by doing business in the state. CTVC of Haw., Co., Ltd. v. Shinawatra, 82 Wn. App. 699, 711, 919 P.2d 1243, 932 P.2d 664 (1996). It can do so by initiating a transaction outside of the state, with the expectation that some part of it will take place in the state. Id. Even if the nonresident did not initiate a transaction in the forum state, it may purposefully act in the state if a business relationship subsequently arises. Id. But, the execution of a contract alone is not sufficient. Id. The court must examine the circumstances surrounding the entire transaction, including prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing. Id.

The purposeful availment analysis focuses on different contacts in the tort context. Pruczinski v. Ashby, 185 Wn. App. 876, 883, 343 P.3d 382 (2015), aff'd, 185 Wn.2d 492, 374 P.3d 102 (2016). In this context, jurisdiction is proper where the nonresident defendant's intentional actions were expressly aimed at the forum state and caused harm in the forum state. Id. Thus, jurisdiction is proper in an intentional tort case where the effects of the defendant's intentional actions are primarily felt in the forum state. Calder v. Jones, 465 U.S. 783, 788-89, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984).

AKAS II urges this court to apply the purposeful direction analysis consistent with the tort line of cases, because Huynh alleges negligence, not a breach of contract. It argues that the trial court erred by considering AKAS II's contract related contacts, rather than looking to AKAS II's alleged tortious conduct. In support of this argument, AKAS II cites two Ninth Circuit cases for the proposition that the purposeful availment test applies in contract cases, while the purposeful direction test applies in tort cases. This contention too broadly summarizes the applicable analysis.

Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797 (9th Cir. 2004) and Roth v. Garcia Marquez, 942 F.2d 617 (9th Cir. 1991) clarify the relationship between the purposeful availment and purposeful direction analyses. The Roth court recognized that distinguishing between contract and tort actions is important in determining whether the forum state has specific personal jurisdiction over the defendant. 942 F.2d at 621. This is so, because in a tort case, there can be personal jurisdiction over a defendant whose only contact with the forum state is the purposeful direction of an act outside the forum state that has an effect within the forum state. Id. But, in a contract case, the existence of a contract with a resident of the forum state alone is insufficient to create personal jurisdiction over the defendant. Id.

In Schwarzenegger, the court acknowledged that the term "purposeful availment" is often used as shorthand for both tests, but purposeful availment and purposeful direction are actually two distinct concepts. 374 F.3d at 802. It noted

16

that the purposeful availment test is "most often used in suits sounding in contract," while the purposeful direction test is "most often used in suits sounding in tort." Id. (emphasis added). To satisfy the purposeful availment test, the plaintiff must produce evidence of the defendant's actions in the forum, which may include executing or performing a contract in the forum. Id. Such actions demonstrate that the defendant purposefully availed itself of the privilege of conducting activities in the forum. Id. In return for receiving the benefits and protections of the forum state's laws, the defendant must submit to the burdens of litigation in the forum state. Id. To satisfy the purposeful direction test, the plaintiff may demonstrate that the defendant's actions outside the forum state were directed at the forum. Id. at 803. Such actions may include distributing goods in the forum state. Id.

Together, these cases indicate that the purposeful availment and purposeful direction cases, rather than only applying in either contract cases or tort cases, are simply two means of meeting the minimum contacts requirement. In a tort case, the nonresident defendant may not have reached out to the forum state to invoke the benefits and privileges of the forum state. But, courts have permitted the forum state to exercise personal jurisdiction over that nonresident defendant if its intentional actions were expressly aimed at the forum state and caused harm that the defendant knows is likely to be suffered in the forum state.[7]

---

[7] AKAS II cites a number of cases in which courts applied a purposeful direction analysis to a negligence claim. See, e.g., Catibayan v. SyCip Gorres Velayo & Co., No. 3:13-CV-00273-HU, 2013 WL 5536868, at *2, *5 (D. Or. Oct. 7, 2013) (court order), aff'd, ; China Energy Corp. v. Hill, No. 3:13-CV-00562-MMD-VPC, 2014 WL 4633784, at *3 (D. Nev. Sept. 15, 2014) (court order); Concord Servicing Corp. v. JPMorgan Chase Bank, NA, No. CV 12-0438-PHX-JAT, 2012 WL 2913282, at *2 (D. Ariz. July 16, 2012) (court order); C.S. v. Corp. of Catholic

Schwarzenegger, 374 F.3d at 803. We reject AKAS II's interpretation of the interplay between these two tests. Because this case is a negligence action stemming from a contractual relationship between the parties, the purposeful availment analysis is sufficient to determine whether AKAS II had the minimum contacts necessary with Washington.

AKAS II further contends that the trial court's consideration of minimum contacts did not comply with the new guidelines laid out in Walden. We disagree. In Walden, two Nevada residents were stopped in the Atlanta airport. 134 S. Ct. at 1119. A Drug Enforcement Administration (DEA) agent seized a large quantity of cash from these travelers before they were permitted to board their plane. Id. The Nevada residents filed suit against the DEA agent in federal court in Nevada, arguing that the agent violated their Fourth Amendment rights. Id. at 1120. The district court dismissed the complaint for lack of personal jurisdiction. Id.

On appeal, the Court noted that the case involves the minimum contacts necessary for specific jurisdiction. Id. at 1121. It repeated that this inquiry focuses on the relationship among the defendant, the forum, and the litigation. Id. And, it stated, "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the

---

Bishop of Yakima, No. 13-CV-3051-TOR, 2013 WL 5373144, at *3-4 (E.D. Wash. Sept. 25, 2013) (court order); Hefferon v. Henry Perez, DDS, PC, No. CIV 11-1541-PHX-MHB, 2011 WL 5974562, at *3 (D. Ariz. Nov. 29, 2011) (court order). However, AKAS II also references a case in which the court applied a purposeful availment analysis to a negligence claim, thereby undercutting its own argument. See Gutman v. Allegro Resorts Marketing Corp., No. 15-12732, 2015 WL 8608941, at *2-3 (E.D. Mich. Dec. 14, 2015) (court order). Thus, we are not persuaded that only the purposeful direction test applies in negligence cases.

forum State." Id. The Court indicated that two aspects of this relationship were at issue: (1) the relationship arises out of contacts that the defendant himself creates with the forum State and (2) the minimum contacts analysis looks to the defendant's contacts with the forum State, not simply residents of the forum State. Id. at 1121-22.

The Court then transitioned to the application of these principles in the context of intentional torts. Id. at 1123. It clarified the extent of the Calder effects test, which permits a state to exercise jurisdiction over a nonresident tortfeasor if the effects of the tort connected the defendant to the forum state, instead of just to the plaintiff. Id. at 1123-24. The Walden court noted that this connection depends significantly on the type of tort alleged—in Calder, the plaintiff alleged libel, which requires publication as an element, so the tort actually occurred in the forum state, where the libelous information was published. Id. at 1124. Applying those principles to the facts of the case, the Court concluded that the DEA agent never formed any relevant contacts with Nevada, as none of his actions took place in Nevada and he never reached out to Nevada. Id. at 1124. Noting that "[w]ell-established principles of personal jurisdiction are sufficient to decide this case," the Court held that the Nevada court could not exercise personal jurisdiction over the DEA. Id. at 1126, 1119.

AKAS II argues that Walden reframed the minimum contacts analysis in a way that requires courts to focus solely on the defendant's suit-related contacts. It points to the Court's statement that minimum contacts require the "defendant's

suit-related conduct [to] create a substantial connection with the forum state." Id. at 1121. And, it argues that after Walden, other courts have interpreted this language to mean that only the defendant's suit-related conduct is relevant in assessing whether minimum contacts are established.[8]

Rather than provide new guidance, the Court specifically stated that well-established principles of minimum contacts supported its decision. Id. at 1126. The language AKAS II relies upon appears directly after the Court, citing a previous decision, stated that the minimum contacts inquiry focuses on the relationship among the defendant, the forum, and the litigation. Id. at 1121 (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)). It repeats this language throughout the opinion. Id. at 1124 ("In short, when viewed through the proper lens—whether the defendant's actions connect him to the forum—petitioner formed no jurisdictionally relevant contacts with Nevada."); id. at 1126 ("The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the

---

[8] AKAS II cites a string of lower court decisions requiring that the defendant's challenged or suit-related conduct relates to the forum state. See, e.g., Cole v. Capital One, NA, No. GJH-15-1121, 2016 WL 2621950, at *3 (D. Md. May 5, 2016) (court order) (the fact that nonresident defendant obtained Maryland resident's credit report did not establish purposeful availment under Walden, because it would make the plaintiff's forum connections decisive in the jurisdictional analysis); Eclipse Aerospace, Inc. v. Star 7, LLC, No. 15 C 1820, 2016 WL 901297, at *4 (N.D. Ill. March 3, 2016) (court order) (focusing on whether the defendants' contacts with the forum " 'directly relate to the challenged conduct or transaction' " (quoting N. Grain Mktg., LLC v. Greving, 743 F.3d 487, 492 (7th Cir. 2014)); Priority Env'tl Solutions, Inc. v. Stevens Co. Ltd., No. 15-CV-871-JPS, 2015 WL 9274016, at *5-6 (E.D. Wis. Dec. 18, 2015) (court order) (noting that the defendant's suit-related conduct must create a substantial connection with the forum state).

litigation.' " (quoting Calder, 465 U.S. at 788)). It is this standard that the Court relied upon in deciding Walden. Its language pertaining to "suit-related contacts" merely restates this inquiry. Id. at 1121. Since the relevant contacts are those connecting the defendant, the forum, and the litigation, those contacts must be suit-related. Id. Far from establishing a new standard, Walden represents a continuation of the Court's personal jurisdiction jurisprudence in the context of intentional torts.

Thus, we analyze the connection among the defendant, the forum, and the litigation. Here, AKAS II reached out to Marel Seattle, a Washington corporation, to provide refurbishment work on the F/V Antarctic Sea. This transaction built on the representatives' prior relationship with Marel Seattle, since the same AKAS employee who had previously worked with Marel Seattle initiated the negotiations. The agreement anticipated that equipment would be manufactured in Seattle, and that the AKAS equipment being stored in Seattle would be utilized. This equipment was to be shipped from Seattle to Uruguay for installation on the F/V Antarctic Sea. The installation of this equipment was to be performed by Marel Seattle employees who would travel from Washington to Uruguay. These contacts demonstrate that AKAS II purposefully established a relationship with Washington, entitling itself to the benefits and privileges of Washington law. AKAS II's relationship with the forum is not merely based on Huynh's residence in Washington, but instead on AKAS II's own decision to do business with a Washington corporation, utilizing Washington workers and equipment stored in Washington. Given these contacts,

it would not be random, fortuitous, or attenuated to expect AKAS II to defend a lawsuit in Washington. We conclude that the purposeful availment factor is satisfied here.

B. Arising From

Next, a claim against a nonresident defendant must arise from the defendant's activities within the forum state. Raymond v. Robinson, 104 Wn. App. 627, 640, 15 P.3d 697 (2001). Washington uses a "but for" test to determine if a nexus exists between the cause of action and the defendant's activities in the forum. Id. This test is satisfied if the events giving rise to the claim would not have occurred but for the defendant's solicitation of business within the forum state. Id.

AKAS II challenges the trial court's use of the but for test to determine whether there is a sufficient nexus between the cause of action and the defendant's contacts with the forum state. It suggests that Walden and Pruczinski call the viability of the but for test into question.

The but for test was adopted by the Washington Supreme Court in Shute. 113 Wn.2d at 772. There, the court recognized that the but for test had been criticized for reaching too far. Id. at 769. But, it determined that any criticisms of the test would be mitigated by an additional consideration: if the connection between the defendant's contacts with the forum and the claim is too attenuated, then jurisdiction would be unreasonable. Id. at 769-70.

Neither Walden nor Pruczinski suggest that the but for test is no longer good law. In Pruczinski, the court set out the principles required by Walden, noting that

22

the nonresident defendant's suit related conduct must create a substantial connection with the forum state, rather than relying on random, fortuitous, or attenuated contacts with the forum state. 185 Wn.2d at 501. And, the court stated that in order for it to exercise jurisdiction over the intentional tortfeasor, the defendant's intentional conduct must create the necessary contacts with the forum. Id.

But, Pruczinski was based on a claim of personal jurisdiction under RCW 4.28.185(1)(b), which permits Washington to exercise jurisdiction over a nonresident defendant who committed a tortious act within the State.[9] Id. at 500-01. The Pruczinski court's Walden analysis sought to balance the application of this specific provision of the long-arm statute with due process considerations. Id. at 501. Walden also was set within the context of an intentional tort. 134 S. Ct. at 1125-26. In neither case did the plaintiff allege that performance of a contract gave rise to the alleged tort.

Our Supreme Court has had multiple opportunities to alter the Shute test post-Walden. See Failla, 181 Wn.2d at 650; FutureSelect, 180 Wn.2d at 963-64; LG Elect., 186 Wn.2d at 176-77. It has not done so. Therefore, we decline to conclude that Walden has altered the Shute test.

---

[9] Washington courts have long applied a different variation of the but for test when personal jurisdiction is alleged to arise under RCW 4.28.185(1)(b). See MBM Fisheries, Inc., 60 Wn. App. at 425 (To satisfy personal jurisdiction under RCW 4.28.185(1)(b), the defendant must have committed a tortious act within Washington, meaning the last event necessary to make the defendant liable for the alleged tort occurred in Washington).

AKAS II also argues that Huynh cannot show the requisite nexus between its contacts with Washington and his cause of action. It contends that tort related injuries cannot arise from contracts for services. AKAS II is correct that a number of courts have determined that a contract for services, without more, is insufficiently related to a tort claim for purposes of personal jurisdiction. See, e.g., Alkanani v. Aegis Defense Servs., LLC, 976 F. Supp. 2d 13, 27-28 (D.D.C. 2014) (contract for services between Department of Defense and Aegis UK did not establish personal jurisdiction over Aegis UK in D.C. for claim that its employee injured Alkanani in Iraq); Gonzalez v. Internacional De Elevadores, SA, 891 A.2d 227, 230, 235-36 (D.C. 2006) (U.S. citizen working at American embassy in Mexico City who was injured due to an elevator malfunctioning could not establish jurisdiction over the Mexican elevator repair company through the repair company's maintenance contract with the embassy); Collazo v. Enter. Holdings, Inc., 823 F. Supp. 2d 865, 867-68, 873-74 (N.D. Ind. 2011) (rental car agreement was insufficient to establish jurisdiction over Enterprise where injury occurred while riding a trolley from the airport to pick up rental car). But, we decline to impose a blanket rule that an injury can never arise from a contract for services for purposes of personal jurisdiction. These cases demonstrate that the facts of the tort will often be too attenuated to be said to arise from a contract. However, the existence of a but for relationship depends on the individual facts of the case.

Turning to the facts of this case, we conclude that the requisite but for nexus existed. The F/V Antarctic Sea contract called for Marel Seattle to send employees

from Washington to Uruguay to perform work on the F/V Antarctic Sea. As a result of this contract, Huynh was sent to Uruguay to work on the F/V Antarctic Sea. He was onboard the F/V Antarctic Sea, performing this work, when he sustained an electrical shock requiring medical care. But for AKAS II reaching out to Marel Seattle to perform work on the F/V Antarctic Sea, Huynh would not have been sent to perform this work. Because we conclude that this connection was not too attenuated to support jurisdiction, the but for test is satisfied here.

C. Fair Play and Substantial Justice

Lastly, the exercise of personal jurisdiction over the defendant must not offend traditional notions of fair play and substantial justice. Raymond, 104 Wn. App. at 641. This factor is examined in light of the quality, nature, and extent of the defendant's activity in the state; the relative convenience of the parties; the benefits and protections of the laws given to the parties; and the basic equities of the situation. Id. This factor serves to prevent jurisdictional rules from making litigation so gravely difficult and inconvenient that a party is severely disadvantaged. Burger King, 471 U.S. at 477-78.

Concerns of fair play and substantial justice weigh in favor of Huynh here. AKAS II purposefully reached out to Marel Seattle in Seattle to form a contract for Marel Seattle employees to refurbish the F/V Antarctic Sea. AKAS II intended for Marel Seattle to utilize equipment that Marel Seattle had stored from a previous AKAS project on the F/V Antarctic Sea. It also intended that Marel Seattle would manufacture items in Seattle to be installed on the F/V Antarctic Sea.

AKAS II is a Norwegian corporation. It is a subsidiary of AKAS, a large Norwegian corporation with a presence in multiple countries, including the United States. AKAS II contends that litigating in Washington would require it to send representatives from Norway and Uruguay, disrupting its business and vessel schedules.

Huynh is an individual living in Washington. Many of Huynh's witnesses, including medical providers, supervisors, and colleagues who were present at the time of the accident, live in Washington. The basic equities weigh in favor of Huynh, an individual who was severely injured, allegedly due to AKAS II's negligence. This factor does not indicate that exercising personal jurisdiction over AKAS II would be unfair or unreasonable. Therefore, we hold that the trial court did not err in denying AKAS II's motion to dismiss for lack of personal jurisdiction.

III. Specific Personal Jurisdiction over AKAS

Huynh contends that the trial court erred in concluding that it did not have personal jurisdiction over AKAS except for its potential liability arising from AKAS II's alleged misconduct. He contends that the trial court should have imputed AKAS II's contacts to AKAS for purposes of exercising personal jurisdiction over AKAS for its own negligence. He further alleges that the trial court should have analyzed whether it had personal jurisdiction over AKAS, independent of the F/V Antarctic Sea contract. And, he argues that the trial court should have applied the doctrine of pendant personal jurisdiction.

A. Imputed Contacts

Huynh argues that the trial court erred by not imputing AKAS II's contacts to AKAS for purposes of AKAS's own liability. Huynh contends that the trial court misinterpreted Harbison v. Garden Valley Outfitters, 69 Wn. App. 590, 849 P.2d 669 (1993) by determining that it could not impute AKAS II's contract contacts to AKAS for claims based on AKAS's direct negligence.

Harbison involved two Idaho corporations. Id. at 592. Garden Valley Outfitters, Inc. sold its assets to Bear Valley Outfitters, Inc. Id. Bear Valley operated a promotional booth at a sports show in Seattle, advertising guided hunting expeditions. Id. The plaintiff reserved a hunting trip at this sports show. Id. Then, Bear Valley returned the business to Garden Valley. Id. Garden Valley assumed Bear Valley's obligations stemming from the Seattle sports show. Id. The plaintiff arrived for the trip and found that the conditions did not meet Bear Valley's representations. Id. at 593. Garden Valley refused to give a refund for the hunting trip. Id. The plaintiff sued. Id.

The Court of Appeals determined that where a successor assumes its predecessor's liabilities, the forum-related contacts of the predecessor may be imputed to the successor for purposes of jurisdiction. Id. at 599. The court reasoned that because the successor purchased assets that were in part derived from the forum and had knowledge of that fact, no policy basis would insulate the successor from liability where its predecessor would have been exposed to jurisdiction. Id.

Huynh asserts that Harbison should also permit a court to impute the predecessor's contacts in determining personal jurisdiction over the successor for the successor's own actions unrelated to the contacts of the predecessor. This argument is inconsistent with Harbison's reasoning. Garden Valley specifically assumed Bear Valley's obligation to the individuals who purchased hunting trips at the Seattle show. Id. at 592. This obligation stemmed directly from Bear Valley's contacts with Washington, and Garden Valley presumably knew that it would be benefiting from these contacts. Id. at 599. The plaintiff's suit arose directly out of this obligation. The Harbison court explicitly linked Bear Valley's contacts to the obligations stemming from those contacts—obligations that passed to Garden Valley as the successor company.

Huynh's proposed interpretation of Harbison would remove this link between the contacts with the forum and the particular assets or liabilities at issue. It would have permitted the Harbison court to impute Bear Valley's Washington contacts to Garden Valley for additional claims that did not originate with Bear Valley's assets or obligations. We decline to adopt such an interpretation. Thus, we hold that the trial court did not err in interpreting Harbison. Accordingly, the trial court properly limited personal jurisdiction over AKAS to AKAS's potential liability for AKAS II's alleged misconduct.

B. Independent Jurisdictional Analysis

Huynh argues that the trial court erred by not considering AKAS's other contacts with Washington, outside of the F/V Antarctic Sea contract. He contends

that even if AKAS was not a party to the contract, AKAS's independent contacts establish personal jurisdiction.

As the trial court recognized, AKAS's contacts with Washington are extensive. It has had an ongoing relationship with Marel Seattle since at least 2005. It previously contracted with Marel Seattle for millions of dollars of work on the F/V Saga Sea. It also owns a krill distributing company, Aker BioMarine Antarctic US Inc., which has two offices in Washington and has sold krill related products in Washington.

However, the relevant nexus between AKAS and the litigation cannot be satisfied here. There must be a but for relationship between the defendant's contacts with the forum and the alleged injury. Shute, 113 Wn.2d at 772. If the connection between the forum related activities and the claim is too attenuated, the exercise of jurisdiction would be unreasonable. Id. at 769-70. Here, Huynh contends that the F/V Antarctic Sea contract would never have been negotiated without the prior history of dealings between AKAS and Marel Seattle. This is the type of attenuated connection that the Shute court sought to avoid. Although the prior relationship between AKAS and Marel Seattle may have influenced the parties' negotiations over the F/V Antarctic Sea project, it is the contract itself that led to Huynh performing work in Uruguay, not the prior relationship. Thus, Huynh cannot meet the second factor of the test. Under an independent analysis of AKAS's contacts with Washington, AKAS is not subject to personal jurisdiction in Washington for its own potential negligence.

## C. Pendant Personal Jurisdiction

Huynh further contends that the trial court erred by failing to consider pendant personal jurisdiction. He argues that because the trial court determined that there was personal jurisdiction over AKAS for its imputed negligence, the court should have applied the pendent personal jurisdiction doctrine to exercise jurisdiction over AKAS for the direct negligence claims.

Pendant personal jurisdiction is a federal case law doctrine.[10] United States v. Botefuhr, 309 F.3d 1263, 1272-73 (10th Cir. 2002). It provides that when a court has personal jurisdiction over defendant for one claim but lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, the court may assert personal jurisdiction over the second claim. Id. at 1272. Even when pendant personal jurisdiction is legally available to the court, the court has discretion over whether to exercise jurisdiction over the pendant personal jurisdiction claims. Id. at 1273.

Huynh recognizes that the doctrine of pendant personal jurisdiction has not been applied in state courts. But, he argues that its applicability in Washington turns on due process. Huynh notes that federal courts have exercised pendant personal jurisdiction in diversity cases, where the only issues are of state law.

---

[10] Unlike the similar doctrine of supplemental subject matter jurisdiction, pendant personal jurisdiction has not been codified by Congress. Botefuhr, 309 F.3d at 1272-73. But, most federal district courts and every circuit court of appeals that have addressed the issue have upheld the doctrine of pendant personal jurisdiction. Id. at 1273.

But, for a court to exercise personal jurisdiction, both Washington's long arm statute and constitutional requirements of due process must be met. Pruczinski, 185 Wn. App. at 882. Thus, even if due process permits a court to exercise pendant personal jurisdiction over a claim that arises from the same nucleus of operative fact as a claim for which the court has personal jurisdiction over the defendant, the long arm statute must also permit jurisdiction. Washington's long arm statute explicitly states, "Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him or her is based upon this section." RCW 4.28.185(3). This provision would appear to preclude claims that arise from the same nucleus of operative fact but would not independently support personal jurisdiction over the defendant. Because pendant personal jurisdiction has not previously been applied in state courts and Washington's long arm statute appears to preclude the application of this doctrine, we decline to apply the doctrine here. We conclude that the trial court did not err when it did not apply pendant personal jurisdiction.

We affirm.

WE CONCUR: