IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| ENGLISH FARM LLC and JENNIFER ENGLISH WALLENBERG, | No. 56890-0-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| CITY OF VANCOUVER; and HP INC., | |
| Respondents, | |
| JLL; JENNIFER BAKER; MARIAN ENGLISH-HUSE; and DON JENNINGS, | |
| Defendants. | |

BIRK, J.* – The City of Vancouver (City) approved HP Inc.'s master plan for future development in an area the parties refer to as "Section 30" of Vancouver. Neighboring parties, English Farm LLC and its owner and operator Jennifer English Wallenberg (collectively, the Winery), argue the approval violated Washington land use law, a development agreement (DA) between the City and the Winery, and due process. The superior court rejected the Winery's claims and dismissed its complaint. We affirm.

---

* Judge Birk is serving in Division II of this court pursuant to RCW 2.06.040.

I

A

Jennifer English Wallenberg's family owns and operates the Winery located in the southwest corner of Section 30 in Vancouver, Washington. In 2006, at the request of several property owners, the City prepared to annex Section 30 and apply a comprehensive development plan and zoning designations. Before the annexation, the English family and the City signed a DA in 2007, allowing the Winery to continue as a preexisting nonconforming use. The DA acknowledged the existence of a 2003 to 2004 "Section 30 Subarea Master Plan" (Subarea Plan) that had been developed "in cooperation with area property owners and residents." The DA stated the City planned to "further refine" the plan in 2007 to 2008 and "[t]he elements of this development agreement will be taken into consideration as the refinement efforts are undertaken."

In 2008, the City annexed Section 30. In 2009, the City enacted Ordinance M-3930, which adopted the Subarea Plan as part of its comprehensive plan under new chapter 20.690 of the Vancouver Municipal Code (VMC). The Subarea Plan contains a number of aspirational and mandatory provisions. Its purpose "recognizes and respects existing property owner development agreements, while proposing a long term vision with flexible plan implementation approaches that reflect market conditions and interests" within the next 20 to 30 years. The Winery was identified as one of 18 key properties of existing use that will likely remain over the life of the 20 to 30 year plan. The Subarea Plan recognized that the Winery "contribute[s] to the character and economic base of Section 30" and that there are no plans for redevelopment. "[T]he retention of a small vineyard on the site is

important to the character of the overall development and provides an aesthetic amenity to the community."

The Subarea Plan also set out master plan policies to ensure a cohesive and integrated employment center. Master plan policies MS-2 and MS-3 state that it is the policy to "[u]se master planning to direct development proposals over time, consistent with the goals and policies of this plan" and to "[r]equire a master plan development approach that supports development of all properties by ensuring compatible development, appropriate buffers or screening, transitional grades," respectively. The Subarea Plan envisioned light and "tech/flex" industrial buildings that would have ceilings over 20 feet. Office buildings expected to be built in Section 30 would be at least three to four stories in height. Chapter 20.690 VMC implements and adopts the Subarea Plan, and VMC 20.690.050 requires the approval of a master plan before development in the plan district and that the master plan be consistent with the Subarea Plan.

The neighboring area was used for gravel mining and other mining related activities for more than four decades. Because of the mining activity, some areas of Section 30 vary in elevation creating substantial side slopes. The western boundary of Section 30 has quarry slopes that are as tall as 70 feet or more. With buildings built into the side of the slope, the design guide recommends that "[c]are should be taken to consider the impact of the proposed construction within 500 feet of homes adjacent to the southwest quarry slope on existing views of Mt. Hood."[1]

---

[1] The Design Guidelines do not reference Mount St. Helens views visible from certain parts of the Winery property.

B

HP has been involved in the Vancouver community for over 35 years. HP owns property adjacent to the Winery property in Section 30. Both properties are zoned to have no height restrictions. HP intends to develop its site. The Winery sold eight acres of its property to HP for the development of HP's project. HP's project included an October 2020 archaeological predetermination survey. The survey found that

> [t]he nearest historic resource is the English Farm. HP Master Plan efforts will have No Effect, directly or indirectly, to English Farm. The development proposed in the Master Plan is to be conduct[ed] below the elevation of English Farm and will not impinge upon the viewshed of this resource.

HP completed a State Environmental Policy Act (SEPA), chapter 43.21C RCW, environmental checklist dated November 3, 2020. Final building heights were not yet determined but the checklist stated that the building heights would take into consideration mountain views for residential neighbors to the west. It also stated that "[p]lanned development is 40 to 50 feet below the adjoining properties with low lying vegetation planned on slopes to screen but not block views." The Winery was listed for historic and cultural preservation and the checklist stated that the Winery would not be directly or indirectly impacted by the project.

HP submitted a master plan dated November 3, 2020. The master plan included building footprints in the full site utilization plan but did not include any heights. The plan recognized that while Section 30 has no height or floor area limits, the building heights would take into consideration mountain views for the neighborhoods to the west. The City ruled the application fully complete on December 4, 2020. It sent a notice of application,

4

remote public hearing, and optional SEPA determination of nonsignificance (DNS) to surrounding property owners. Comments on the project received by January 18, 2021 would be incorporated into the staff report and comments received after would be addressed at the public hearing. Subsequently, the City issued a DNS.

English e-mailed her concerns about the master plan on January 18, 2021 stating that the buildings "appear to be 90 feet tall" and that this would obstruct views of Mount St. Helens from the Winery. This assessment was ostensibly based on a portion of the HP master plan including diagrams meant to show that views from other, residential areas to the west would suffer only limited impact from potential buildings on the site, in a section otherwise discussing utility access to the site. English's reference to potential 90 foot buildings was ostensibly extrapolated from a sketch included in the master plan. The Winery later argued that the HP master plan was described "publicly" four months after the December 2020 SEPA checklist leading to the DNS, apparently referring to the public hearing in April 2021. But it is clear from English's January e-mails that English had the master plan, reviewed it, and identified the building height issue in January 2021.

English and her counsel participated and spoke in numerous hearings, wrote letters, and provided testimony for public hearings.

At an April 19, 2021 public hearing, the City Council asked for more information "to better understand the view standards that are already in the plan, how those translate into regulatory standards." HP responded to this request and addressed the Winery's concerns about views in two letters addressed on May 4 and May 17, 2021. In its May 4, 2021 letter, HP asserted that view impacts to the Winery from its master plan were not

significant. HP stressed that its master plan was not required to have the heights included and that its proposal complied with the design guidelines. HP's letter stated that even if it built infinitely tall buildings, the Winery would still have "a significant portion of its northern frontage that would provide a view of [Mount] St. Helens for visitors to walk and observe."

Legal counsel for the Winery responded with a letter dated May 13, 2021 opposing the approval of HP's master plan. The letter argued that HP's master plan did not substantively analyze whether the application met the Section 30 requirements for a master plan. It argued that the buildings outlined in the master plan and HP's new letter were likely to block or change wind patterns, which could detrimentally affect the Winery's ability to grow grapes. In a May 17, 2021 letter, HP reiterated that in the design phase, it will take into consideration building heights and consider its neighbors. HP asserted the master plan's scale was not meant to be used to calculate heights. Once site planning started, HP would consider the Winery and other comments that were raised in the public review process. The letter argued none of the concerns the Winery raised—reduction of wind flow, historic resource protection, shadows on the vineyard, or damage to grapes from reflective material—could be assessed because no site plan had been proposed yet.

The last public hearing concerning HP's master plan was held on May 17, 2021. The Winery argued that HP's proposed building locations and orientations threaten the economic vitality of the Winery, and the master plan does not address the ways HP plans to mitigate those harms. The City asked HP to address the differing opinions on the view of Mount St. Helens. HP explained that the Subarea Plan, various policies, and the DA

discuss encouraging the preservation and economic vitality of the Winery and the Winery continuing as a nonconforming use. HP also noted consideration of views of Mount St. Helens would come into consideration at the site planning stage when considering the actual siting of buildings, their orientation, and any direct impact on a particular use. HP argued Winery visitors were already required to walk to specific sites on the Winery property to view Mount St. Helens. HP argued there were other ways for the Winery to adapt to the changing development patterns.

C

The City had prepared a staff report on the HP master plan to determine if it should be approved. The report analyzed the HP master plan for compliance with regulations, code criteria, and SEPA, and to determine whether potential impacts were mitigated. The staff report noted that there are no building height restrictions within the ECX (employment center mixed-use) zone and that the HP master plan does not contain any heights, but states that the height of the buildings will be a minimum of 24 feet. It also reported that "[b]uilding height will be reviewed for adherence to the Section 30 Design Guidelines at the time of site plan submittal." The staff report recommended conditioning approval on three criteria that must be met before any future site plans are approved. The City approved the HP master plan subject to conditions recommended in the staff report. The conditions of approval were:

1. Demonstrate compliance with the provisions of VMC 20.690 and all applicable sections of the Section 30 Plan and Design Guidelines as modified by the 2019 Development Agreement and provided in the Master Plan.

2. Show compliance with the Master Plan SEPA checklist or amend or submit a new SEPA checklist to include any unexpected impacts or project changes.

3. Include this note on Civil Plans:
   Trees and Shrubs in Sight Distance Triangles:
   All shrubs within sight distance triangles shall be maintained so that foliage height above pavement does not exceed 2.5 feet. Street trees within sight distance triangles shall be limbed up to a height of 10 feet consistent with ANSI A300 standards to provide for sight distance visibility.

The Winery challenged the approval of the HP master plan in superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW, the Growth Management Act (GMA), chapter 36.70A RCW, and SEPA. Additionally, the Winery asserted that the City's approval of the HP master plan violated its due process rights and was a breach of the DA. The superior court dismissed the Winery's claims in two orders, one dismissing the Winery's breach of contract claim pursuant to CR 12(b)(6), and another dismissing the remainder of its claims on summary judgment. The Winery appeals.

II

A

LUPA is the exclusive means, with limited exceptions, by which superior courts obtain authority to provide judicial review of local land use decisions. *Cave Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 656, 401 P.3d 327 (2017). On review of a superior court's decision under LUPA, we sit in the same position as the superior court and review the same record that was created before the hearings examiner. *Miller v. City of Sammamish*, 9 Wn. App. 2d 861, 870, 447 P.3d 593 (2019); *see also* RCW 36.70C.120(1). On appeal, the party who filed the LUPA petition has the burden of establishing that the

land use decision was erroneous. *Fuller Style, Inc. v. City of Seattle*, 11 Wn. App. 2d 501, 507, 454 P.3d 883 (2019). We view the facts and inferences in a light most favorable to the party that prevailed below. *Fams. of Manito v. City of Spokane*, 172 Wn. App. 727, 739-40, 291 P.3d 930 (2013).

The Winery rests its GMA challenge on three grounds under RCW 36.70C.130(1), which affords relief if the Winery establishes:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court; [or]

> (d) The land use decision is a clearly erroneous application of the law to the facts.

We review an issue under subparagraph (b) de novo. *Whatcom County Fire Dist. No. 21 v. Whatcom County*, 171 Wn.2d 421, 426-27, 256 P.3d 295 (2011). We review an issue under subparagraph (c) for substantial evidence. *Phoenix Dev. Inc. v. City of Woodinville*, 171 Wn.2d 820, 828-29, 256 P.3d 1150 (2011). Under this standard, facts and inferences are viewed in a light most favorable to the party that prevailed in the forum with the highest fact-finding authority. *Id.* Substantial evidence is supported if there is "a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." *Id.* at 829. And we review an issue under subparagraph (d) using the clearly erroneous standard. *Id.* A finding is clearly erroneous when the reviewing court "is left with a definite and firm conviction that a mistake has been committed." *Id.* We

defer to factual determinations made the highest body that exercised fact finding authority under this standard. *Fams. of Manito*, 172 Wn. App. at 740.

B

Under the GMA, cities and counties with certain specified populations must adopt comprehensive plans. *Futurewise v. Spokane County*, 23 Wn. App. 2d 690, 694, 517 P.3d 519 (2022), *review denied*, ___ Wn.2d ___, ___ P.3d ___, 2023 WL 2809542; Former RCW 36.70A.040 (2014). The comprehensive plan is the core of the GMA and must contain detailed policies that aid in the growth of public facilities and the development and use of land as prescribed by the statute. *Futurewise*, 517 P.3d at 694. A proposed land use decision need only generally conform to the comprehensive plan. *Spokane County v. E. Wash. Growth Mgmt. Hrg's Bd.*, 176 Wn. App. 555, 574-75, 309 P.3d 673 (2013); *Woods v. Kittitas County*, 162 Wn.2d 597, 613, 174 P.3d 25 (2007).

Under the GMA, city actions are presumed compliant but the deference afforded is bound within the goals and requirements of the statute. *Whatcom County v. Hirst*, 186 Wn.2d 648, 666-67, 381 P.3d 1 (2016). A city's action will be found compliant unless the action is " 'clearly erroneous in view of the entire record . . . and in light of the goals and requirements of [the GMA].' " *Id.* at 667 (second alteration in original) (quoting RCW 36.70A.320(1), (3)). Goals set forth in a comprehensive plan may be mutually competitive at times and the weighing of those competing goals is a "fundamental planning responsibility of the local government." *Spokane County v. E. Wash. Growth Mgmt. Hrg's Bd.*, 173 Wn. App. 310, 333, 293 P.3d 1248 (2013). When "[a]ny policies or goals" in a

10

comprehensive plan are "hortatory, not mandatory," the responsibility to weigh competing goals and policies is that of the county commissioners. *Id.* at 342.

The Winery contends HP's master plan does not generally conform to the planning principles established in the Subarea Plan and the provisions of the Vancouver Municipal Code implementing it. We conclude the City's approval of the master plan is not clearly erroneous because of a failure to generally conform to the Subarea Plan and corresponding code provisions.

1

Subarea Plan land use policy LU-21 states its purposes include to "[e]ncourage the preservation and economic vitality of the English Vineyard and Winery." The Subarea Plan sets out six master plan policies to "balance predictability with flexibility, be fair to all, and promote desired development." These policies are as follows:

MS-1  Create a Section 30 Plan District to address the plan area's unique circumstances and to ensure cohesive development.

MS-2  Use master planning to direct development proposals over time, consistent with the goals and policies of this plan

MS-3  Require a master plan development approach that supports development of all properties by ensuring compatible development, appropriate buffers or screening, transitional grades, efficient extension of public utility services, and effective transportation and pedestrian connectivity.

MS-4  Allow existing mining activities to continue under the review of the Vancouver zoning standards

MS-5  Recognizing that market dynamics create new development, the implementation strategy should afford a reasonable degree of flexibility while addressing important public policy issues.

11

    MS-6 Establish design standards and guidelines to direct new development in a way that is consistent with the Section 30 Plan vision.

  VMC 20.690.010 states that the purpose of the Subarea Plan is to "provide clear objectives for those proposing to develop in the Section 30 Plan area; maintain and enhance property values; promote economic provision of public services; and ensure that each development or project fits with its neighbors and within the Subarea." VMC 20.690.050(B)(7) states that master plans must include an "[a]nalysis of impacts to the adjacent properties and mitigation proposed to achieve development envisioned in the Section 30 Employment Center Plan including future streets, roundabouts, grading, utility service, site drainage, trails and open space and land use location." VMC 20.690.060(D)(1) states that the planning official shall approve a site utilization plan based on demonstration of "a realistic assessment of future building types and sizes, and future parking needs."

  Neither the Subarea Plan nor the VMC expressly protect a view from the Winery's property of Mount St. Helens. The only Section 30 guideline regarding height states that "[c]are should be taken to consider the impact of proposed construction within 500 feet of homes adjacent to the southwest quarry slope on existing views of Mt. Hood." VMC 20.690.040(B) explicitly states that "[b]uilding heights *shall not* be restricted within the ECX zoned properties of the Plan District." (Emphasis added.) The Winery has no common law right to a view. *Asche v. Bloomquist*, 132 Wn. App. 784, 797, 133 P.3d 475 (2006). The Winery has no right to a view conferred to it by statute, ordinance, or a restrictive easement. *Id.* at 797-98. The Winery's sale of eight acres to HP did not include a restrictive covenant or easement guaranteeing the right to an unobstructed view of Mount St. Helens. Specifically concerning the view of Mount St. Helens from parts of its property,

the Winery is protected only to the extent development standards incorporate as a consideration "the preservation and economic vitality" of the Winery. The record developed below is unclear as to the importance of any view of Mount St. Helens to the preservation and economic vitality of the Winery.

2

HP's master plan considered elevations and grading. It considered streets and traffic impacts stemming from future growth. It analyzed different types of parking lots and stated it would undertake a parking study after Phase 1 development was operational. The master plan looked at open spaces and public facilities. It analyzed public utilities and services. The master plan demonstrated that there would be adequate buffers and screening, utility services, and plenty of pedestrian and traffic connectivity. The master plan included a proposed drawing of potential building locations and the area of each but no heights.

VMC 20.690.060(D)(1) required only the demonstration of "a realistic assessment of future building types and sizes, and future parking needs." HP complied with these requirements. The master plan included an assessment of the approximate area of the the buildings, building types, proposed streets, and three different layouts for parking lots. There is no indication of building heights, but specific heights were not required.

The Winery argues that the master plan failed to analyze the impact that wind, glare, view obstructions, and "heat sinks" from parking lots would have on the Winery. But HP responded to each of the Winery's concerns and possible ways to mitigate any harm. In its May 17, 2021 letter, HP provided an extensive response concerning the potential change

in wind patterns on the Winery. It cited studies and articles that a change in wind may either have a detrimental or beneficial effect on the grapes. The master plan stated that it would choose design materials for the buildings during the site planning stage, and therefore it could not address potential glare at this stage, but that it would likely be minimal because of the depression and the planned development below the grade of the Winery site. The master plan addressed the potential heat sink problem by proposing the parking lot be interspersed with trees that would reduce heat buildup. HP addressed ways to mitigate the concerns raised by the Winery. The City could validly conclude the master plan and HP generally conformed with VMC 20.690.060(D)(1) and the Subarea Plan goals. Approval of the master plan was not clearly erroneous.

The Winery also argues that the master plan failed adhere to the "Elevations and Grading" (GE) element GE-1 in the Subarea Plan, which states that "[m]aster plans for individual developments should include an analysis of grade transitions on development sites and potential impacts on adjacent properties." HP's master plan addresses this policy directly. In addition, to gain approval, the master plan was required to "[e]stablish[] property grades and finished elevations that allow for balanced grade transitions between properties." VMC 20.690.050(C)(4)(f). The master plan includes such an analysis.

In proceedings before the City, HP repeatedly told the Winery that it would consider views when it was considering heights for its buildings in the site planning stage, and the master plan states that it would take views into consideration. At oral argument in

14

this court, when asked whether the statement about building heights in the checklist would apply in evaluation of future site plans, HP answered,

> Of course it will, because you have to do SEPA at every site plan application. And so if there's a change, then the views will have to be taken into consideration against the checklist, and it will have to be modified, and HP would definitely do that. We're not going to skirt SEPA.

Wash. Court of Appeals oral argument, *English Farms LLC v. City of Vancouver*, No. 56890-0-II (Jan. 24, 2023), at 18 min, 34 sec. to 18 min, 52 sec., https://tvw.org/video/division-2-court-of-appeals-2023011379/?eventID=2023011379.

This is consistent with the conditions of approval the City imposed, under which development under the master plan must "[s]how compliance with the Master Plan SEPA checklist or amend or submit a new SEPA checklist to include any unexpected impacts or project changes."

The HP master plan and the correspondence by the Winery and HP before the City show that there were ample grounds for the City to conclude that the HP master plan generally conformed to the principles of the Subarea Plan and related provisions of the VMC. The Winery does not show that the City was required, in order to comply with the GMA and SEPA, to insist on a given height limitation of HP's buildings. This is especially so where HP agrees that at the site planning stage the City must consider the environmental impact of specific, proposed structures, including on the Winery and other adjacent properties. We conclude the City's approval of the HP Master Plan is not "clearly erroneous" and thus entitled to the presumption of compliance. For the same reasons, and to the extent other standards of review are implicated in the Winery's challenge, the Winery

has not shown that the City made an error of law or that its approval of the HP master plan was not supported by substantial evidence.

III

The Winery argues that the City's decision violated SEPA and the City should have withdrawn its DNS. We conclude the Winery waived this claim.

Before a plaintiff can file a SEPA action alleging noncompliance, the plaintiff must exhaust available administrative remedies. *CLEAN v. City of Spokane*, 133 Wn.2d 455, 465, 947 P.2d 1169 (1997). If appeal procedures are in place, the party is required to use those procedures before seeking judicial review. *Id.* If a plaintiff fails to allege or prove that administrative remedies were exhausted, we will consider no appeal was made. *Id.*

The Winery concedes it did not appeal the City's DNS. The SEPA appeal process ended on February 8, 2021 and no appeals were made. The Winery argues that the SEPA checklist and associated January 2021 DNS were later belied by HP's public discussion of its master plan in April 2021, which the Winery contends forecasts taller buildings that, contrary to the DNS, would affect the Winery. Therefore, the Winery reasons, the assumptions underlying the DNS changed and the DNS must be withdrawn based on the new disclosure. However, the record does not bear out this argument. The Winery inferred an intent by HP to build to a given height based on the Winery's review of the master plan sometime in December 2020 and January 2021—well before the SEPA appeal deadline expired. HP, for its part, disavowed that the section of the plan relied on by the Winery was meant to describe, let alone commit to, building to a given height. The record does

16

not bear out the Winery's argument that the baseline conditions originally supporting the DNS changed. The Winery waived any SEPA noncompliance claim.

IV

The Winery argues that the City denied it due process and failed to follow established procedures. We disagree.

Due process requires that a person must be provided with notice and an opportunity to be heard before the government can deprive them of their life, liberty, or property. *Samuel's Furniture Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 462-63, 54 P.3d 1194 (2002); U.S. CONST. amend. XIV, § 1. This requires the opportunity to be heard and notice reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Matter of Deming*, 108 Wn.2d 82, 96, 736 P.2d 639, 744 P.2d 340 (1987) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S. Ct. 779, 58 L. Ed. 1363 (1914)). We review constitutional issues involving land use and ordinance decisions de novo. *Griffen v. Thurston County*, 137 Wn. App. 609, 620, 154 P.3d 296 (2007), *aff'd*, 165 Wn.2d 50, 196 P.3d 141 (2008). To assert a due process claim under LUPA, a person must show that they have a constitutionally protected property interest. *See Durland v. San Juan County*, 182 Wn.2d 55, 69, 340 P.3d 191 (2014). "A constitutionally protected property interest exists when a plaintiff demonstrates that [they] possess[] a 'legitimate claim of entitlement' under the law." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)).

17

The Winery knew of the City's development agreement with HP and sold HP eight acres of its land to help the project. The Winery received the notice of application, remote public hearing, and optional SEPA DNS. The Winery sent e-mails to Councilmembers, submitted multiple pieces of written testimony for public hearings, and English and her attorney spoke on behalf of the Winery at the hearings. The Winery admits that the City never limited the length of its written testimony. Instead, the Winery points to the fact that it was given three minutes to present at the last public hearing as evidence that its due process rights were violated. The Winery contrasts this with the approximately 40 minutes it says HP spent presenting its master plan. The Winery's argument is misleading. The Winery and its lawyer and several aligned speakers *each* were given three minutes, which was allowed for any member of the public wishing to address the master plan at the public meeting. The Winery fails to demonstrate or allege that the City violated VMC 20.210.120(B)(9)(a), which allows "[t]he Hearings Examiner or Planning Commission [to] set reasonable time limits for oral presentations and may limit or exclude cumulative, repetitious, irrelevant or personally derogatory testimony."

The record also does not bear out the Winery's claim that the City never received its May 17, 2021 testimony. The day of the hearing, the Winery's attorney requested that the full testimony be included in the record and the City responded that it would be in time for the meeting. The Winery's attorney mentioned to the Councilmembers during her testimony that the Winery submitted written testimony because its presentation time was limited. The content of the May 17, 2021 written comment is substantially reflected in the Winery's counsel's oral presentation on May 17, 2021. Therefore, even if the City did not

18

receive the written testimony in time, it cannot be said that the Winery's opportunity to be heard was violated. Moreover, the record as a whole shows the City held a public comment period, multiple Planning Commission workshops, and two public hearings. The Winery submitted extensive comment, and the City and HP responded to the Winery's questions and concerns through hearings, letters, and e-mails. The Winery does not show a due process violation.

V

The Winery argues that the trial court erroneously dismissed its breach of contract claim. We disagree.

We review de novo a trial court's ruling on a motion to dismiss under CR 12(b)(6). *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 962, 331 P.3d 29 (2014). Dismissal is appropriate where it appears beyond a reasonable doubt that a plaintiff will be unable to prove any set of facts that would justify recovery. *Id.* We assume the truth of the allegations in the plaintiff's complaint as well as hypothetical facts consistent with the allegations. *Id.* at 962-63. The court may consider any written instrument attached as an exhibit to the complaint, which is "a part thereof for all purposes." CR 10(c); *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 830 n.7, 355 P.3d 1100 (2015) (consideration of documents only *alleged* in the complaint). We are not required to accept legal conclusions as true. *Jackson v. Quality Loan Serv. Corp.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015). Here, the Winery attached the DA to its complaint, so it may be considered in deciding the City's CR 12(b)(6) motion.

In order to prevail on a breach of contract claim, the plaintiff must show a valid contract, breach of a duty arising under that contract, and resulting damage. *Silvey v. Numerica Credit Union*, 23 Wn. App. 2d 535, 544, 519 P.3d 920 (2022). We give the words in a contract their ordinary, plain, and popular meaning. *134th St. Lofts LLC v. iCap Nw. Opportunity Fund LLC*, 15 Wn. App. 2d 549, 563, 479 P.3d 367 (2020). The focus is on the parties' intent by looking to their " 'objective manifestations of the agreement' " that correspond to " 'reasonable meaning of the words used.' " *Id.* at 562 (quoting *Hearst Commc'ns Inc v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). We conclude the Winery's allegations and hypothetical facts that may be drawn consistent with them fail to allege a breach of the DA.

The DA states, "The City hereby agrees to recognize the English Family's existing uses as legal nonconforming uses." Other terms of the DA provide that the listed preexisting uses of the Winery properties "shall not be subject to any land use laws, regulations, or ordinances enacted after said Uses became vested," and that "[t]he elements of this development agreement will be taken into consideration as the refinement efforts are undertaken" in the development of the Subarea Plan. We accept as part of the CR 12(b)(6) analysis that the City agreed not to make the Winery's nonconforming use "subject to" future land use ordinances and to "take[] into consideration" the DA in developing the Subarea Plan. But the Winery falls short of alleging factual circumstances permitting the conclusion that the City has failed to perform these promises. The Winery continued as a legal nonconforming use on its own property unaffected by the City's approval of a master plan for future development of a neighboring property. The Winery's

20

allegations do not show the City failed to take the DA into consideration, and the master plan requires that future development on the HP site will take the Winery into consideration. Because the Winery did not adequately allege a breach of the DA, we affirm the trial court's dismissal of its breach of contract claim.[2]

VI

HP requests attorney fees on appeal pursuant to RCW 4.84.370. Under this statute,

> reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals . . . of a decision by a . . . city . . . to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision.

RCW 4.84.370(1). An award of attorney fees is required under this statute if the prevailing party was the prevailing or substantially prevailing party before the city, and was the prevailing or substantially prevailing party in all prior judicial proceedings. RCW 4.84.370(1)(a)-(b). HP meets these statutory requirements, and we accordingly award HP its attorney fees subject to its further compliance with RAP 18.1(d). The City did not comply with RAP 18.1(b), and therefore is not entitled to and is not awarded attorney fees or other expenses. HP and the City are awarded statutory costs as prevailing parties under RAP 14.2.

Affirmed.

---

[2] Because our analysis of breach is dispositive of the Winery's breach of contract claim, we do not reach the parties' arguments on this claim regarding standing, the duty of good faith and fair dealing, causation, or damages.

No. 56890-0-II/22

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
BIRK, J.

We concur:

_____
GLASGOW, J.

_____
CHE, J.